## IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF COLUMBIA

| | |
|---|---|
| **THE NATIONAL HEP–CAMP ASSOCIATION**, <br> 337 Waldo Hall, <br> Corvallis, Oregon 97331. <br><br><br> Plaintiff, <br><br> v. <br><br> **U.S. DEPARTMENT OF EDUCATION and LINDA MCMAHON**, in her official capacity as the U.S. SECRETARY OF EDUCATION, 400 Maryland Avenue, S.W. Washington, D.C. 20202 <br><br> Defendants. | Case No. 25-cv-2730 |

## <u>COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MANDAMUS RELIEF</u>

Plaintiff the National HEP–CAMP Association ("the Association") brings this Complaint for Declaratory, Injunctive, and Mandamus Relief against Defendants the U.S. Department of Education (the "Department" or "ED") and Linda McMahon in her official capacity as the U.S. Secretary of Education (the "Secretary"). The Association is contemporaneously filing a Motion for Preliminary Injunction.

## <u>PRELIMINARY STATEMENT</u>

Not unlike recent executive agency efforts to withhold funding across all sectors of government, the U.S. Department of Education and its Secretary[1] have now delayed spending Congressionally-appropriated funds on two long-running grant programs in the United States: the High School Equivalency Program ("HEP") and the College Assistance Migrant Program ("CAMP"). Plaintiff the National HEP–CAMP Association is the sole advocacy organization for

---

[1] This Complaint refers to the Secretary and the Department collectively as the "Department" unless stated or context suggests otherwise.

these programs, and its members are the colleges, universities, and nonprofit organizations that participate in them. The Department has suddenly stopped awarding these grants, missing a mandatory July 1, 2025 deadline to do so, without providing any notice or explanation for its inaction to the Association's members.

Created more than 50 years ago, the HEP and CAMP programs, vis-à-vis grant recipients, support students from migrant and seasonal farmworker families at the secondary and postsecondary education levels. As Congress has observed, there are "unique characteristics and needs of the migrant and seasonal farmworker population." 20 U.S.C. § 1070d-2(d). Beyond the economic, social, and political barriers this population faces, the transient nature of migrant and seasonal farmwork poses significant educational obstacles. These families frequently move to "follow the harvest" and pursue new work as the seasons change. For their children, who often labor alongside their families in the fields, the path to earning a traditional high school diploma, and college degree is anything but easy.

The 1960 documentary *Harvest of Shame*, to which some attribute HEP's and CAMP's genesis, presented some striking statistics of what life was like for these families before HEP and CAMP: approximately one out of 500 children of migrant farmworkers finished grade school, approximately one out of every 5,000 finished high school, and there was no case on record of a child of a migrant farmworker receiving a college diploma.[2] As startling as the film was, it brought these farmworker families' plight into public eye.

In the years that followed, Congress acted to authorize grant programs to assist migrant youth earn the equivalent of a high school diploma (HEP) and to support them in college (CAMP). Through appropriating federal dollars to fund HEP and CAMP over the last several decades,

---

[2] *See* Edward R. Murrow, Harvest of Shame, CBS News, at 29:54–30:14, *available at* https://www.cbsnews.com/video/1960-harvest-of-shame/.

Congress has maintained the federal government's commitment to these programs and recognized the tangible benefits they provide migrant and seasonal farmworker communities across America.

Congress did so again this year when it appropriated $52 million in fiscal year 2025 funds to the Department to award HEP and CAMP grants. Congress made an initial tranche of funds "available" to the Department on July 1, 2025, and the remainder becomes available on October 1, 2025. Congress directed the Department to use these funds to "carry out" HEP and CAMP during the July 1, 2025 – June 30, 2026 year on which they have operated for decades.

Historically, and most recently between 2020 and 2024, following appropriations legislation, the Department issues new HEP and CAMP grant awards *before* July 1 of the year. These grant awards became effective July 1 and commit federal monies to funding the grant recipient's activities through the following June 30. The grants are for five years—the period prescribed by Congress under the Higher Education Act—but Department funding each individual year is contingent on annual appropriations and on recipients' meeting reporting and other requirements. Provided these conditions are met, the Department issues "continuation awards," also before July 1, committing to funding the next year on July 1. These funds are disbursed— made available to recipients—*on* July 1, enabling them to continue operating their projects and providing services to students, including during the summer months, knowing their expenses will be paid. This timing—the Department's issuing of awards and making funds available on July 1— has been adhered to by the Department for years.

Not so in 2025. Despite Congress's appropriating $52 million to HEP and CAMP for the July 1, 2025 – June 30, 2026 year, the Department has effectively ended the programs through silence and inaction. At no time before or after July 1, 2025 has the Department awarded any grants or disbursed any funds to the Association's members—or to other HEP or CAMP programs for

that matter. In fact, the Department has done nothing at all. Over the last several weeks, the Association and its members have repeatedly reached out to the agency for answers. The Department has not even responded.

The Association's members affected by the Department's inaction fall into two main groups: one consists of members that timely applied in 2024 for new five-year grants that the Department was legally required to act upon by July 1 but did not. The second group consists of members with active five-year grants that do not expire until June 30 in future years. The Department was required by law to issue them continuation awards (or communicate a decision to not issue continuation awards) by July 1 but did not.

The Department's inaction and delay is unlawful. The Secretary "shall maintain and expand" HEP and CAMP, the Secretary "shall award" HEP and CAMP grants, and Congress made money "available on July 1" to the Department to "carry out" HEP and CAMP for the 2025-2026 year that has already begun. As an Executive Branch agency, the Department has neither authority nor discretion to *not* act upon the Applications for New Awards (as defined below), to *not* issue Continuation Awards (as defined below), and to *not* spend Congressionally-appropriated funds.

This fact pattern may sound familiar, as the Association's members currently find themselves in a position not unlike the states that also recently saw their funds under similar programs with July 1 start dates frozen. Only after the states sued to compel the release of those funds did the Department relent.[3] Unless the agency affords the same treatment to the Association's members here—and there is no reason why it should not—the Court should order it to do so.

---

[3] *See* discussion *infra* Subsection F.

It is no secret that the current Administration wants to cut spending in numerous areas. With respect to HEP and CAMP (and the programs the states sued over), the President has targeted them for elimination in fiscal year 2026. Be that as it may, fiscal year *2026* is not at issue. Congress appropriated $52 million in fiscal year *2025* funds for HEP and CAMP. "[A]n agency may not rely on political guesswork about future congressional appropriations as a basis for violating existing legal mandates." *In re Aiken Cnty*., 725 F.3d 255, 260 (D.C. Cir. 2013) (Kavanaugh, J.). The Department is statutorily required to "carry out" these programs and is statutorily required to obligate these funds through issuing grants. The Constitution directs the Legislative Branch to make spending decisions but directs the Executive Branch to "take care" these decisions be implemented. This the Department has not done.

The consequences to the Association, its affected members, and to students, are devastating. The Association exists *because* of HEP and CAMP, and its members' projects rely heavily, if not exclusively, on these federal grant funds. Already, the members' projects are shuttering, employees are being laid off, and students are losing vital resources.

For the reasons discussed in this Complaint (and in the accompanying Motion for Preliminary Injunction), the Court should declare that the Department's inaction is unlawful; compel agency action, including by mandamus, that has been unlawfully withheld and unreasonably delayed; and enter preliminary and ultimately permanent injunctive relief directing the Department to issue the Continuation Awards, to act upon the Applications for New Awards, and to disburse Congressionally-appropriated fiscal year 2025 funds to HEP and CAMP, consistent with its duties under the law.

## JURISDICTION AND VENUE

1.      The Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1361, the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, and the Administrative Procedure Act

("APA"), 5 U.S.C. §§ 701–06, as the Association's claims are brought against an agency and officer of the United States and arise under the Constitution and acts of Congress.

2.    This Court is authorized to issue injunctive and declaratory relief under 28 U.S.C. §§ 2201–02, Federal Rules of Civil Procedure 57 and 65, the Court's inherent equitable powers, and the APA, 5 U.S.C. § 706.

3.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e)(1)(A) because the Department and the Secretary are U.S. agencies or officers sued in their official capacities. Additionally, venue is proper pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1)(B) because a substantial part of the events or omissions giving rise to this Complaint occurred and continues to occur in this district.

## PARTIES

4.    Plaintiff the National HEP–CAMP Association is the sole national advocacy organization in the United States for HEP and CAMP.

5.    A nonprofit incorporated in the District of Columbia in 2001 and headquartered in Oregon, the Association is dedicated to furthering the expansion of opportunities for students in the United States who are from migrant and seasonal farmworker families.

6.    HEP and CAMP are the only federal programs that help the children of these workers—a unique population of students that face tremendous obstacles—obtain a high school equivalency credential and pursue postsecondary education.

7.    The Association comprises more than 80 member institutions of higher education ("IHEs") and nonprofit organizations that operate either a HEP or a CAMP project, or both.

8.    The Association provides numerous services to its members, including education, resources, and technical assistance, and through its members, to the students who participate in HEP and CAMP projects.

9.     The Association also performs research that informs policymakers, educators, and the public on issues impacting educational opportunities and outcomes for students from migrant and seasonal farmworker families.

10.     Prior to the Department's inaction, the Association's members were collectively operating more than 115 HEP and CAMP projects. In total, their projects served between 6,000 and 7,000 students annually. The members' projects are overseen by full-time employees and staff members at their various locations.

11.     The continued viability and success of the Association's members and their projects, and the critical educational support and opportunities they provide students, are at the core of the Association's mission.

12.     The Association's members directly harmed by the Department's inaction fall into two groups.

13.     The first group includes members that timely applied for new five-year HEP and/or CAMP grants in 2024, which, had they been selected and timely acted upon by July 1, would have been effective on July 1, 2025. As of today, these members still have not received decisions on their applications.

14.     The second group includes members that applied for and were awarded new five-year HEP and/or CAMP grants, effective July 1 of either 2021, 2022, 2023, or 2024. Thus, their grants have not expired yet. These members submitted the required reports and information to the Department to obtain a continuation award for the July 1, 2025 – June 30, 2026 year. As of today, these members have not been informed about the status of their continuation awards.

15.     Unless distinguished, this Complaint collectively refers to the Association's members in both groups as the "Affected Members."[4]

16.     Defendant the U.S. Department of Education is an executive agency of the U.S. government. The Department's principal address is 400 Maryland Avenue, SW, Washington, D.C. 20202.

17.     Defendant Linda McMahon is the Secretary of the U.S. Department of Education. McMahon, as Secretary, is charged with supervision and management of all decisions and actions of the Department. The Association sues the Secretary in her official capacity. Her official address is 400 Maryland Avenue, SW, Washington, D.C. 20202.

## FACTUAL BACKGROUND

### A.  The Formation, History, and Current State of HEP and CAMP

#### i.  The Federal Government Creates Grant Programs for Migrant Students under the Economic Opportunity Act of 1964

18.     During the 1960s, President Lyndon B. Johnson and Congress declared a "War on Poverty," and took action to create and expand numerous statutory programs for assisting the economically disadvantaged, a group that includes migrant and seasonal farmworkers.

19.     Migrant and seasonal farmworker families move frequently, and these frequent disruptions contribute to substantial numbers of migrant youth dropping out during high school. With each move, migrant students have to adapt to a new school, a new curriculum, different standards, and different testing criteria. The negative effect that mobility has on school achievement is well documented.[5]

---

[4] A list of Affected Members and their corresponding Continuation Awards and Applications for New Awards at issue is set forth in an exhibit being filed with the Association's Motion for Preliminary Injunction.
[5] *See* Loida C. Velazquez, *Migrant and Seasonal Farmworkers, A Forgotten Population* (1990), *available at* https://files.eric.ed.gov/fulltext/ED329411.pdf.

20.     Migratory youth often help their families perform agricultural work, and many travel without a parent or guardian to obtain migratory work in the fields and in agricultural processing. Migrant youth also have responsibilities at home, such as caring for younger siblings and older family members, or helping with other family needs, all of which are duties that limit time that could otherwise be spent on schooling and enrichment activities.

21.     In addition to being highly mobile, migratory youth tend to live in poverty and have limited English proficiency, and their families are more likely to experience food and job insecurity as well as poor health and housing conditions.

22.     In the years after *Harvest of Shame* brought attention to migrant and seasonal farmworkers' conditions and their distinct lack of political power, the federal government took action.

23.     In 1964, Congress passed and President Johnson signed the Economic Opportunity Act ("EOA"). *See* Economic Opportunity Act of 1964, Pub. L. No. 88-452, 78 Stat. 508.

24.     The EOA created the Office of Economic Opportunity ("OEO") to coordinate federal antipoverty initiatives, including those for "rais[ing] and maintain[ing] the income and living standards of low-income rural families and migrant agricultural employees and their families." *See* § 301(a) (creating Special Programs to Combat Poverty in Rural Areas), § 601(a) (creating the OEO), 78 Stat. at 524, 528.

25.     In 1967, Congress amended Part B of Title III of the EOA by authorizing the Director of OEO to carry out programs designed "to equip unskilled migrant and seasonal farmworkers and members of their families as appropriate through education. . . ." Economic Opportunity Amendments of 1967, Pub. L. No. 90-222, § 312(b)(3), 81 Stat. 672, 709–10.

26.     In amending Part B, Congress stated that "[t]he purpose of this part is to assist migrant and seasonal farmworkers and their families to improve their living conditions and develop skills necessary for a productive and self-sufficient life in an increasingly complex and technological society." § 312, 81 Stat. at 709.

27.     Congress therefore authorized the Director to "provide financial assistance to assist State and local agencies, private nonprofit institutions and cooperatives in developing and carrying out programs to fulfill the purpose of this part." § 311, 81 Stat. at 710.

28.     That same year, the Director established the grant program known as HEP to provide financial assistance in the form of grants to support migrant and seasonal farmworkers— or their immediate family members—who dropped out of high school to help them pursue and obtain a high school equivalency credential. *See Message from the President of the United States Transmitting the Third Annual Report of the Office of Economic Opportunity* 39, (Oct. 12, 1968).

29.     HEP's sister program, CAMP, was later established through the OEO in 1972. CAMP sought to overcome the same fundamental obstacles facing migrant and seasonal farmworker students but at the postsecondary education level.

30.     Initially, HEP and CAMP grants were awarded to a small number of IHEs and nonprofit organizations by the OEO in conjunction with the Office of Education within the then-existing Department of Health, Education, and Welfare.

31.     In 1976, Congress transferred HEP and CAMP to the Secretary of Labor. *See Education Amendments of 1976*, Pub. L. No. 94-482, § 521(b), 90 Stat. 2081, 2238.

32.     Then, in 1978, Congress established express statutory authority for HEP and CAMP as part of the Comprehensive Employment and Training Act ("CETA"). *See Comprehensive Employment and Training Act of 1978*, Pub. L. No. 95-524, § 303(c)(2)(A)

(HEP), § 303(c)(2)(B) (CAMP), 92 Stat. 1909, 1964, amending Comprehensive Employment and Training Act of 1973, Pub. L. No. 93-203, § 303, 87 Stat. 839, 859.

### ii. Congress Transfers Authority for HEP and CAMP to the Higher Education Act

33.    Later, in the 1979 Department of Education Organization Act, oversight of HEP and CAMP was transferred to the newly created U.S. Department of Education. *See* Department of Education Organization Act, Pub. L. No. 96-88, § 303(a), 93 Stat. 668, 680 (1979).

34.    A year later, statutory authority for HEP and CAMP was formally removed from CETA and incorporated into the Higher Education Act, where both programs remain today. *See* Education Amendments of 1980, Pub. L. No. 96-374, § 406, 94 Stat. 1367, 1411–12; 20 U.S.C. § 1070d-2 (titled "Maintenance and expansion of existing programs").

35.    Passed in 1965—also as part of the War on Poverty—the landmark Higher Education Act created a broad array of federal financial aid programs to assist students and their families with the cost of paying for college, including grant programs that provided funds directly to postsecondary institutions to operate educational support projects that would help students attend and succeed in college. *See* Higher Education Act of 1965, Pub. L. No. 89-329, 79 Stat. 1219 (1965).

36.    Since 1965, the HEA has been amended and extended several times.[6] The HEA today is organized into eight titles, and HEP and CAMP are authorized under Title IV – specifically, under Section 418A, Subpart 5 of Part A of Title IV. *See* 20 U.S.C. §§ 1070d-2(b) (HEP); 1070d-2(c) (CAMP); Pub. L. No. 110-315, § 408; 122 Stat. at 3233.

37.    Part A of Title IV's purpose is "to assist in making available the benefits of postsecondary education" by "providing for special programs and projects designed . . . to identify

---

[6] The HEA was most recently reauthorized in 2008. *See* Higher Education Opportunity Act of 2008, Pub. L. No. 110-315, 122 Stat. 3078 (2008).

and encourage qualified youths with financial or cultural need with a potential for postsecondary education [and] to prepare students from low-income families for postsecondary education . . . ." *See* 20 U.S.C. § 1070(a)(4).

38.    HEP and CAMP grants are awarded on a competitive basis to institutions of higher education ("IHEs") and to private nonprofit organizations working in cooperation with IHEs that operate projects providing educational, financial, counseling, and other forms of assistance to migrant and seasonal farmworker students at the secondary and postsecondary education levels. *See generally* 20 U.S.C. § 1070d-2.

39.    The Secretary is required to carry out HEP and CAMP. The statute's "Program Authority" provision states: "[t]he Secretary shall maintain and expand existing secondary and postsecondary high school equivalency program and college assistance migrant program projects located at institutions of higher education or at private nonprofit organizations working in cooperation with institutions of higher education." 20 U.S.C. § 1070d-2(a).

40.    For both HEP and CAMP, "[e]xcept under extraordinary circumstances, the Secretary shall award grants for a 5-year period." 20 U.S.C. § 1070d-2(e).

41.    HEP and CAMP are coordinated through the Department's Office of Elementary and Secondary Education, Office of Migrant Education ("OME"). *See* Education Amendments of 1984, Pub. L. No. 98-511, § 701, 98 Stat. 2366, 2405 (codified at 20 U.S.C. § 3414).

42.    OME's "mission" is "to provide excellent leadership, technical assistance, and financial support to improve the educational opportunities and academic success of migrant children, youth, agricultural workers, fishers, and their families."[7]

---

[7] *See* Department of Education, About the Office of Migrant Education, *available at* https://www.ed.gov/about/ed-offices/oese/office-of-migrant-education (last accessed Aug. 15, 2025). Along with HEP and CAMP, the OME administers the Migrant Education Program, which is a separate formula grant program to provide financial assistance to state education agencies to

**B.  Details of HEP and CAMP**

    **i.  High School Equivalency Program (HEP)**

43.    The High School Equivalency Program (HEP) is specifically designed to assist migratory and seasonal farmworkers "who are 16 years of age and over" and who "lack a high school diploma or its equivalency." *See* 20 U.S.C. § 1070d-2(b)(1).

44.    HEP grant recipients are specifically authorized to perform "recruitment services to reach" such individuals. 20 U.S.C. § 1070d-2(b)(1).

45.    Upon enrollment in HEP projects, recipients are authorized to provide these students "educational services which provide instruction designed to help [them] obtain a general education diploma which meets the guidelines established by the State in which the project is located for high school equivalency." 20 U.S.C. § 1070d-2(b)(2).

46.    Recipients are also authorized to provide students with "supportive services," including "personal, vocation, and academic counseling," "placement services" designed to help students pursue postsecondary education or training, find employment, or enter military service, and various other activities and services "to improve persistence and retention in postsecondary education." *See* 20 U.S.C. § 1070d-2(b)(5)–(9).

47.    HEP serves approximately 4,000 students annually. *See* Department of Education, *Education for the Disadvantaged Fiscal Year 2025 Budget Request* at 62 (hereinafter, Education for the Disadvantaged).[8]

    **ii.  College Assistance Migrant Program (CAMP)**

48.    The College Assistance Migrant Program (CAMP) is designed to assist migratory and seasonal farmworkers in college.

---

establish and improve educational programs for children of migratory farmworkers and fishers. *See* 20 U.S.C. §§ 6391–99.

[8] *Available at* https://www.ed.gov/media/document/edpdf-39366.pdf.

49.     Like HEP, CAMP authorizes grant recipients to provide services to students, primarily during their first year of college, including "outreach and recruitment services;" "supportive and instructional services to improve placement, persistence, and retention in postsecondary education;" "assistance in obtaining student financial aid;" and "housing support for students living in institutional facilities and commuting students." 20 U.S.C. § 1070d-2(c)(1)(A)–(D).

50.     Recipients, however, also must provide "followup services" after students finish the first year of college, including by "monitoring and reporting" on their "academic progress," by ensuring they receive academic, counseling, and financial aid services, and by encouraging students at two-year institutions to transfer to four-year institutions. *See* 20 U.S.C. § 1070d-2(c)(2)(A)–(C).

51.     CAMP serves approximately 2,000 participants annually. *See* Education for the Disadvantaged, *supra* ¶ 47 n.8 at 62.

### iii. HEP and CAMP Student Eligibility

52.     To be eligible to participate in a HEP or CAMP project, "[a] person, or his or her immediate family member, must have spent a minimum of 75 days during the past 24 months as a migrant or seasonal farmworker." *See* 34 C.F.R. § 206.3(a)(1); *see also* 20 U.S.C. § 1070d-2(b)(1)(B)(i), 20 U.S.C. § 1070d-2(c)(1)(A).

53.     A "seasonal farmworker" is defined as "a person whose primary employment was in farmwork on a temporary or seasonal basis (that is, not a constant year-round activity) for a period of at least 75 days within the past 24 months." 34 C.F.R. § 206.5(c)(8).

54.     A "migrant farmworker" is defined as "a seasonal farmworker . . . whose employment required travel that precluded the farmworker from returning to his or her domicile (permanent place of residence) within the same day." 34 C.F.R. § 206.5(c)(7).

55.     "Immediate family member" means one or more of the following:

- A spouse;
- A parent, step-parent, adoptive parent, foster parent, or anyone with guardianship; or
- Any person who claims the individual as a dependent on a Federal income tax return for either of the previous two years, or resides in the same household as the individual, supports that individual financially, and is a relative of that individual.

*See* 34 C.F.R. § 206.5(c)(5).

## C. Funding of HEP and CAMP and the Process of Awarding Grants

### i. Congressional Funding Process for HEP and CAMP

56.     Although the Secretary is required to "maintain and expand existing [HEP and CAMP] program projects" under the HEA, 20 U.S.C. § 1070d-2(a), Congress's separate act of appropriating funds to the Department enables—and requires—the Secretary to carry out these duties.

57.     "Appropriations" are laws in which Congress grants "budget authority" to federal agencies. Budget authority gives agencies the legal authority to enter into financial "obligations" in the amounts Congress specified that will result in the immediate or future "expenditure" of federal dollars. *See* U.S. Gov't Accountability Off., *A Glossary of Terms Used in the Federal Budget Process*, GAO-05-734SP, at 14, 20–21, 48, 70 (2005) ("GAO Budget Glossary");[9] *see also New York v. Trump*, 769 F. Supp. 3d 119, 128–29 (D.R.I. 2025) (surveying the appropriations process) (discussing 2 U.S.C. § 622(2)(A)(i)).

58.     An "obligation" is a "definite commitment that creates a legal liability of the government for the payment of goods and services ordered or received, or a legal duty on the part of the United States that could mature into a legal liability." *See* GAO Budget Glossary, *supra* ¶ 57 n.9, at 70.

---

[9] *Available at* https://www.gao.gov/assets/gao-05-734sp.pdf.

59.    The act of awarding a grant is an "obligation." *See Cong. Rsch Serv.*, R44477, Department of Education Funding: Key Concepts and FAQ 2 (2019)[10] ("Once an agency receives its budget authority, it may take actions to obligate it legally, for example, by signing contracts or grant agreements."); *see also* GAO Budget Glossary, *supra* ¶ 57 n.9, at 70 ("An agency incurs an obligation, for example, when it . . . awards a grant . . . or takes other actions that require the government to make payments to the public or from one government account to another.").

60.    Meanwhile, "an 'expenditure,' also known as a 'disbursement,' is the actual spending of federal funds.'" *New York v. Trump*, 769 F. Supp. at 128 (quoting GAO Budget Glossary).

61.    Three important aspects of Congressional appropriations legislation are relevant here.

62.    *First*, Congress in an appropriations act will specify the purposes for which it appropriates federal funds to agencies to incur obligations and make expenditures. The so-called federal "purpose statute" provides that "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law," 31 U.S.C. § 1301(a), that is, funds can only be used for the purposes that Congress has designated.

63.    For example, relevant here, Congress appropriates funds to the Department for the purposes of "carrying out" various projects and activities authorized under laws that the Department administers, such as Title IV of the HEA. *See, e.g.*, Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 460, 682 (2024).

64.    *Second*, Congress appropriates funds to executive agencies by "account." An "account" is a "financial reporting unit for budget, management, and/or accounting purposes." *See*

---

[10] *Available at* https://www.congress.gov/crs_external_products/R/PDF/R44477/R44477.4.pdf.

GAO Budget Glossary, *supra* ¶ 57 n.9, at 2. An appropriations account "typically encompasses a number of activities or projects . . . ." *Id.*

65.     For example, relevant here, Congress appropriates funds to the Department under an account titled "Education for the Disadvantaged." This account includes the HEP and CAMP programs under Title IV of the HEA, as well as programs authorized under the Elementary and Secondary Education Act of 1965 ("ESEA"):

- Special Programs for Migrant Education [HEP and CAMP] (HEA IV-A)
- State agency programs, including migrant grants (ESEA I-C) and neglected and delinquent, and at-risk children and youth (ESEA I-D)
- Grants to local educational agencies (ESEA-1-A)
- Comprehensive literacy development grants (ESEA II-B-2)

*See* Education for the Disadvantaged, *supra* ¶ 47 n.8 at 8.

66.     *Third*, Congress specifies the time period for which it gives agencies budget authority—*i.e.*, the authority to enter into obligations and disburse funds. This time period is sometimes referred to as the "period of availability."

67.     The default period of availability is the federal fiscal year, which is between October 1 and September 30; for example, fiscal year 2025 runs from October 1, 2024 through September 30, 2025. *See* 31 U.S.C. § 1102.

68.     But Congress may use alternate periods of availability that do not align with the federal fiscal year. "Alternate periods of availability typically are used to meet specific budgetary needs related to a program's purpose or structure." *See Cong. Rsch. Serv.*, R43482, Advance Appropriations, Forward Funding, and Advance Funding: Concepts, Practice, and Budget Process Considerations 2 (2019).[11]

---

[11]*Available at* https://www.congress.gov/crs_external_products/R/PDF/R43482/R43482.8.pdf.

69.     The two primary alternate funding periods used by Congress are "advance appropriations" and "forward funding." *See Cong. Rsch Serv.*, R44477, Department of Education. Funding: Key Concepts and FAQ, *supra* ¶ 59 n.10, at 9.

70.     "Advance appropriations" occurs when the funds appropriated first become available for obligation by the agency during the *following* fiscal year.

71.     "Forward funding" occurs when the funds appropriated first become available for obligation by the agency during the *final quarter* of the current fiscal year (on July 1) and remain available into the following fiscal year.

72.     Forward-funded appropriations that remain available for obligation through the *end* of the following fiscal year are classified as providing a "multi-year period of availability." *See Cong. Rsch. Serv.*, R43482, Advance Appropriations, Forward Funding, and Advance Funding: Concepts, Practice, and Budget Process Considerations, *supra* ¶ 68, n.11, at 1, 7.

73.     Forward-funded appropriations and advance appropriations are often used in combination for educational programs that do not operate on the federal fiscal year but instead on a differing fiscal, academic, or school year, and particularly for programs that engage in summer activities.

74.     "In general, the advance appropriations-forward funding combination is used for accounts that provide funds to recipients . . . who might experience service disruptions if they received funds aligned with the federal fiscal year and not the academic or school year. One advantage of this approach is that it allows schools to obligate funds prior to the start of the school year. It also gives schools time to plan for, and adjust to, changes in federal funding levels." *See Cong. Rsch. Serv.*, R44477, Department of Education Funding: Key Concepts and FAQ, *supra* ¶ 59 n. 10, at 10.

75.    Congress has used this combined forward-funding, advanced appropriations approach for HEP, CAMP and the ESEA programs in the Education for the Disadvantaged account for decades. *See Cong. Rsch. Serv.*, R43482, Advance Appropriations, Forward Funding, and Advance Funding: Concepts, Practice, and Budget Process Considerations *supra* ¶ 68, n.11, at 7 ("Forward funding combined with advance appropriations was provided by the Education for the Disadvantaged (Department of Education) account").).

76.    HEP and CAMP (and the ESEA programs) operate on a July 1 through June 30 fiscal year (often referred to as their "budget year" or "program year") and provide student services year-round, including during the summer months right before the academic year begins. "Academic years" vary from institution to institution, but they often begin in August.

77.    Accordingly, Congress uses forward-funding to give the Department budget authority to incur obligations and expend an initial tranche of funds to carry out HEP and CAMP beginning on July 1, and advance appropriations giving it budget authority to incur obligations and expend the remaining funds beginning on October 1, all of which remain available through the following September 30. "Forward funding part or all of a program . . . allows for obligations to occur up to three months prior to [the start of the following federal fiscal year] so that the availability of funds coincides with the program year." *See Cong. Rsch. Serv.*, R43482, Advance Appropriations, Forward Funding, and Advance Funding: Concepts, Practice, and Budget Process Considerations *supra* ¶ 68, n.11, at 7–8.

**ii.  Congress's 2024 Appropriations Legislation**

78.    Appropriations legislation in 2024 illustrates how these concepts work. Congress appropriated fiscal year 2024 funds to the Department to carry out HEP and CAMP and certain ESEA programs for "academic year 2024-2025":

> For carrying out title I and subpart 2 of part B of title II of the Elementary and Secondary Education Act of 1965 (referred to in this Act as ''ESEA'') **and section 418A of the Higher Education Act of 1965** (referred to in this Act as ''HEA''), $19,107,790,000, of which $8,179,490,000 ***shall become available on July 1, 2024, and shall remain available through September 30, 2025***, and of which $10,841,177,000 shall become available on October 1, 2024, and ***shall remain available through September 30, 2025, for academic year 2024–2025***: . . . . *Provided further*, That $224,000,000 shall be for carrying out subpart 2 of part B of title II: **Provided further, That $52,123,000 shall be for carrying out section 418A of the HEA**.''

Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, tit. III, 138 Stat. 460, 681–82 (2024) (emphases added) (the "2024 Appropriations Act").

79.    A portion of fiscal year 2024 funds "bec[a]me available" for obligation and expenditure by the Department on July 1, 2024, and the remaining funds became available on October 1, 2024 (and remain available through September 30, 2025), to fund HEP and CAMP.

80.    Generally, when Congress provides budget authority (*i.e.*, authority to incur obligations and expend funds) by making them "available" on a specific date, such as July 1, agencies may not *disburse* the funds before that date.

81.    But once appropriations legislation is enacted and budget authority is provided, agencies can enter into obligations in advance that commit the agency to disburse the funds on the date that budget authority becomes available, such as by awarding a grant on May 1 that commits to agency to disbursing funds on July 1.

82.    This is why, as detailed below, the Department historically made both new and continuation HEP and CAMP awards *before* July 1 of every calendar year. These grants served to "obligate" Congressionally-appropriated funds for the Department's future disbursement to grant recipients *on* July 1 of that same year.

83.    Grant recipients themselves may also be authorized to spend obligated funds outside of the federal fiscal year in which they were appropriated. The General Education Provisions Act, 20 U.S.C. §§ 1221 *et seq.*, which applies to Title IV programs administered by the

Secretary, including HEP and CAMP, *id.* § 1221(c)(1), provides that "[a]ppropriations for any fiscal year for grants . . . may, in accordance with regulations of the Secretary, be made available for obligation by the recipient on the basis of an academic or school year differing from such fiscal year," *id.* § 1225(a).

84.     For example, while the 2024 federal fiscal year ran from October 1, 2023 to September 30, 2024, Congress appropriated funding to HEP and CAMP for the "academic year 2024-2025." The Department, prior to July 1, 2024, issued new and continuation awards that obligated the funds to HEP and CAMP recipients for the July 1, 2024 – June 30, 2025 year on which they operate, made funds available on July 1, 2024, and authorized recipients to draw on those funds (or seek reimbursement) to provide student services between July 1, 2024 and June 30, 2025. Unobligated and unexpended fiscal year 2024 funds remain available for the Department's obligation and disbursement through September 30, 2025 (even today), but they generally only may fund projects' activities carried out during the July 1, 2024 – June 30, 2025 year.

85.     As detailed later below, Congress appropriated fiscal year 2025 funds to the Department to "carry out" HEP and CAMP in the same amount and in the same manner as it had for fiscal year 2024. *See* discussion *infra* Section E.ii.

### iii. The Department's Process for Awarding HEP and CAMP Grants

86.     The HEP and CAMP application and award process is detailed primarily in the Education Department General Administrative Regulations found at 34 C.F.R. Part 75, and the HEP and CAMP program regulations found at 34 C.F.R. Part 206.[12] *See also* 34 C.F.R. § 206.30

---

[12]     *See* Department of Education, *Discretionary Grantmaking at ED* 14 (2024), https://www.ed.gov/media/document/grantmaking-ed-108713.pdf (hereinafter "Discretionary Grantmaking") ("ED generally uses two types of regulations to award and administer grants: program regulations and administrative regulations. . . . Program regulations apply to all

(with respect to HEP and CAMP, "[t]he Secretary evaluates an application under the procedures in 34 CFR part 75.").

87.     The process begins when the Secretary announces "priorities" that it proposes to follow when deciding to which applicants it will award new grants. Priorities include "invitations," "competitive preference," and "absolute preference." 34 C.F.R. § 105(c)(1)–(3).

88.     The Secretary is required to publish the proposed priorities in the Federal Register and to solicit public comment. *See* 34 C.F.R. § 75.105(b)(1)–(2).

89.     Once the final priorities are established, the Secretary publishes a notice inviting applications for a new grant award in the *Federal Register*. 34 C.F.R. § 75.100(a)–(b). *See* Discretionary Grantmaking, *supra* ¶ 86 n.12, at 43.

90.     Applicants must follow strict procedures when submitting grant applications. Among other things, an application must "cover[] a period of five years unless extraordinary circumstances" and "include[] an annual budget of not less than $180,000." 34 C.F.R. § 206.20(b); 20 U.S.C. § 1070d-2(f).

91.     Both HEP and CAMP are "discretionary" grant programs, meaning they "permit the Secretary to use discretionary judgment in selecting applications for funding." 34 C.F.R. § 75.1(b); 34 C.F.R. § 75.200(a).[13]

92.     Upon receiving applications, the Secretary evaluates applications against the Department's priorities and selection criteria, and scores each application against the same. *See* 34

---

applicants and/or grantees under a particular program. . . . Administrative regulations apply to all grantees.").

[13] Discretionary grants are contrasted with formula grants, which entitle applicants to receive grants if they meet the requirements of the program. Formula grant applicants do not compete with each other for funds. *See* 34 C.F.R. § 75.1.

C.F.R. § 75.200; 34 C.F.R. § 75.105; 34 C.F.R. § 217; 34 C.F.R. § 206.30; *see also* 20 U.S.C. § 1070d-2(e) (requiring Secretary to consider applicants' prior experience operating project).

93.    If an application is selected, the Secretary issues a formal "notification of grant award" to the recipient—known as a "GAN." *See* 34 C.F.R. § 75.235(a).

94.    "The notification of grant award sets the amount of the grant award and establishes other specific conditions, if any." 34 C.F.R. § 75.235(b).

95.    "The grant obligates both the Federal Government and the grantee to the requirements that apply to the grant." 34 C.F.R. § 75.236.

96.    Meanwhile, "the Secretary informs an applicant if its application . . . (1) [i]s not evaluated; or (2) [i]s not selected for funding." *See* 34 C.F.R. § 75.218(a).[14]

97.    As noted above, "[e]xcept under extraordinary circumstances, the Secretary shall award [HEP and CAMP] grants for a 5 year period." 20 U.S.C. § 1070d-2(e).

98.    This five-year period is a multi-year "project period," which is "[t]he total amount of time, shown with a 'start' date and an 'end' date, for which the Department will fund a grant and authorize a grantee to conduct the approved work of the project described in the application." *See* Discretionary Grantmaking, *supra* ¶ 86 n.12, at 49; *see also* 34 C.F.R. § 75.250; 34 C.F.R. § 77.1(c) (defining "project period").

99.    When the Department issues a multi-year grant award, it "usually approves a budget period of not more than 12 months, even if the project has a multi-year project period." *See* 34 C.F.R. § 75.251(a); *see also* 34 C.F.R. § 77.1(c) ("Budget period means an interval of time into which a project period is divided for budgetary purposes.").

---

[14] *See also* Department of Education, *Getting Started with Discretionary Grant Applications | U.S. Department of Education* ("The Department will also notify unsuccessful applicants that their applications were not selected for funding."), *available at* https://www.ed.gov/grants-and-programs/apply-grant/getting-started-discretionary-grant-applications.

100.    "If the Secretary approves a multi-year project period, the Secretary: (1) Makes a grant to the project for the initial budget period; and (2) Indicates his or her intention to make continuation awards to fund the remainder of the project period." 34 C.F.R. § 75.251(b)(1)–(2).

101.    Unlike for the initial application process, "[a] grantee does not have to compete with other applicants to receive" a continuation award. *See* Discretionary Grantmaking, *supra* ¶ 86 n.12, at 45.

102.    Rather, under 34 C.F.R. § 75.253(a), "in order to receive a continuation award from the Secretary for a budget period after the first budget period of an approved multiyear project, [a grantee] must—

> (1) Either—
>
>> (i) Demonstrate that it has made substantial progress in achieving—(A) The goals and objectives of the project; and (B) The performance targets in the grantee's approved application, if the Secretary established performance measurement requirements for the grant in the application notice; or
>>
>> (ii) Obtain the Secretary's approval for changes to the project that—(A) Do not increase the amount of funds obligated to the project by the Secretary; and (B) Enable the grantee to achieve the goals and objectives of the project and meet the performance targets of the project, if any, without changing the scope or objectives of the project;
>
> (2) Submit all reports as required by § 75.118;
>
> (3) Continue to meet all applicable eligibility requirements of the grant program;
>
> (4) Maintain financial and administrative management systems that meet the requirements in 2 CFR 200.302 and 200.303; and
>
> (5) Receive a determination from the Secretary that continuation of the project is in the best interest of the Federal Government.

*See* 34 C.F.R. § 75.253(a).

103.    Under 34 C.F.R. § 75.253(f), "[t]he Secretary may decide not to make a continuation award if . . . (1) A grantee fails to meet any of the requirements in paragraph (a) of this section; or (2) A grantee fails to ensure that data submitted to the Department as a condition

of the grant meet the definition of 'quality data' in 34 CFR 77.1(c) and does not have a plan acceptable to the Secretary for addressing data-quality issues in the next budget period." 34 C.F.R. § 75.253(f).

104.    If the Secretary "decides not to make a continuation award . . . the Secretary will notify the grantee of that decision, the grounds on which it is based, and, consistent with 2 CFR 200.342, provide the grantee with an opportunity to request reconsideration of the decision." 34 C.F.R. § 75.253(g).

105.    "If the Secretary makes a continuation award . . . [t]he Secretary makes the award under §§ 75.231 through 75.236; and . . . [t]he new budget period begins on the day after the previous budget period ends." 34 C.F.R. § 75.253(d).

106.    Upon receipt of a continuation award and the start of the new budget period, recipients "are authorized to incur financial obligations of the funds awarded." 2 C.F.R. § 200.1.

107.    Grantees receive funds by making requests through G6 (formerly known as G5). *See* Discretionary Grantmaking, *supra* ¶ 86 n.12, at 30.

**D.   The Secretary Issues Notices of Invitation for HEP and CAMP Grants**

108.    Each year between 2019 and 2024, the Department invited applications for new HEP and CAMP grants to begin on the following July 1. *See* Notices Inviting Application—High School Equivalency Program, 89 Fed. Reg. 70604 (Aug. 30, 2024), 88 Fed. Reg. 78002 (Nov. 14, 2023), 86 Fed. Reg. 68648 (Dec. 3, 2021), 85 Fed. Reg. 74707 (Nov. 23, 2020), 84 Fed. Reg. 65791 (Nov. 29, 2019); Notices Inviting Application —College Assistance Migrant Program, 89 Fed. Reg. 70610 (Aug. 30, 2024); 88 Fed. Reg. 77996 (Nov. 14, 2023); 87 Fed. Reg. 2600 (Jan. 18, 2022), 86 Fed. Reg. 68653 (Dec. 3, 2021); 85 Fed. Reg. 74701 (Nov. 23, 2020); 84 Fed. Reg. 65795 (Nov. 29, 2019) (altogether, "Notices Inviting Application").

109.    Each notice described the priorities that the Department would use in making decisions to award a new grant. *See* Notices Inviting Application, *supra* ¶ 108 (describing priorities).

110.    During this time period, the Association's Affected Members timely applied for new HEP and CAMP grants, and the Department notified the Affected Members that their applications had been selected. The Department therefore issued GANs to the Affected Members.

111.    For example, after certain Affected Members applied in 2019 for new HEP and CAMP awards, the Department issued them GANs, prior to July 1, 2020 ("2020 GANs").

112.    The 2020 GANs stated that the "Performance Period" of the grant is "07/01/2020 – 06/30/2025" and that the initial "Budget Period" is 07/01/2020 – 06/30/2021." The 2020 GANs thus committed funding the July 1, 2020 – June 30, 2021 budget period.

113.    Other Affected Members in subsequent years also successfully applied for new HEP and CAMP grants and thus were awarded GANs, also prior to July 1.

114.    After each budget period ended, Affected Members timely submitted reports and information to the Department demonstrating "substantial progress" towards achieving their projects' goals and performance objectives, as required to obtain continuation awards for the following budget period.

115.    The Department likewise issued continuation awards to the Affected Members *prior* to the following budget period beginning July 1, and made funds available to them on July 1—until it failed to do so in 2025.

116.    Specifically, prior to 2025, between April and June of every year, the Department notified applicants for new HEP and CAMP awards whether their applications were selected, and notified existing grant recipients whether they were receiving continuation awards.

117.    The Department has recognized the importance of issuing timely awards—both new and continuing. It previously explained that "In FY 2021 and FY 2022, the Department continued to make awards to new and existing projects earlier in the fiscal year. In doing so, projects have more time to enroll students for programs that begin in the fall and, if planned by the project, to allow students to participate in a project-funded summer learning program. The Department aims to continue making awards on this earlier timeline so grantees can effectively identify and recruit participants for the academic year and offer services, as appropriate, before student arrival." *See* Department of Education, *Report to Congress High School Equivalency Program (HEP) and College Assistance Migrant Program (CAMP) Fiscal Year (FY) 2024*, at 3.[15]

**E.  The Department's Action in 2024 and Inaction in 2025 Regarding HEP and CAMP**

**i.    The Department Issues 2024 Notices of Invitation for New HEP and CAMP Awards**

118.    In August 2024, the Department issued notices of invitation to apply for new five-year HEP and CAMP grants "for fiscal year (FY) 2025." *See* Notice Inviting Application —High School Equivalency Program, 89 Fed. Reg. 70604 (Aug. 30, 2024); Notice Inviting Application—College Assistance Migrant Program, 89 Fed. Reg. 70610 (Aug. 30, 2024) (together, 2024 Notices Inviting Applications).

119.    The August 2024 notices stated that the Department's issuance of new HEP and CAMP awards was contingent on federal fiscal year 2025 funding. *See* 2024 Notices Inviting Application, Section II Award Information, *supra* ¶ 118. Specifically, the notices explained that "[t]he actual level of funding, if any, ***depends on final congressional action***. However, we are inviting applications to allow enough time to complete the grant process if Congress appropriates funds for this program." *Id.* (emphasis added).

---

[15]    *Available at* https://www.ed.gov/media/document/hep-camp-evaluation-webinar-transcript-109131.pdf.

120.    The notices directed applicants to submit applications to the Department by November 13, 2024. *See* 2024 Notices Inviting Application, *supra* ¶ 118.

121.    The notices stated that the "deadline for intergovernmental review" of applications was January 13, 2025. *See* 2024 Notices Inviting Application, *supra* ¶ 118.

122.    Also in August 2024, the Department published application packages for new HEP and CAMP grant awards.[16]

123.    The application packages stated that "Grants are expected to be awarded in May 2025." *See* 2025 HEP/CAMP Application Packages, *supra* ¶ 122 n. 16, at 4; *see also* Office of Migrant Education, *Fiscal Year (FY) 2025 High School Equivalency Program (HEP) and College Assistance Migrant Program (CAMP) Pre-Application Webinar Questions and Answers* at 1 ("Grants are expected to be awarded in May 2025").[17]

124.    Several of the Association's members timely applied in 2024 for new five-year HEP and CAMP grants which, if selected, would have been begun on July 1, 2025 (the "Applications for New Awards"). Among members that applied were those that had received the 2020 GANs, and thus, whose grants were set to expire on June 30, 2025.

125.    Meanwhile, recipients who received GANs between 2021 and 2024, their grants do not expire until June 30 in future years between 2026 and 2029. As required in order to secure continuation awards, funding the budget period beginning July 1, 2025 (the "Continuation Awards"), they timely submitted the required reports and information to the Secretary.

---

[16] *See* Department of Education, *Application for New Grants under the High School Equivalency Program* at 4, https://www.ed.gov/media/document/hep-applicaiton-package-108060.pdf; Department of Education, *Application for New Grants Under the College Assistance Migrant Program* at 4, https://www.ed.gov/media/document/2025-camp-application-package-10424-108058.pdf (together, "2025 HEP/CAMP Application Packages").

[17] *Available at* https://www.ed.gov/media/document/fy-2025-hep-and-camp-pre-application-webinar-qs-and-108227.pdf.

**ii.  Congress Passes Continuing Resolutions that Appropriate Fiscal Year 2025 Funds to HEP and CAMP for the June 1, 2025 – June 30, 2026 Year**

126.    Congress has appropriated funds to the Department to carry out HEP and CAMP every year since they were transferred to the HEA.

127.    As detailed above, in the 2024 Appropriations Act, Congress appropriated $52.12 million to the Department to "carry out" HEP and CAMP projects for the 2024-2025 academic year. *See* 2024 Appropriations Act, div. d, tit. III, 138 Stat. at 682 ("Provided further, That $52,123,000 shall be for carrying out section 418A of the HEA."); *see also supra* Section C.ii (discussing 2024 appropriations for HEP and CAMP).

128.    The Department carried out this directive. In the first half of calendar year 2024, the Department acted upon and collectively awarded 115 new and continuation HEP and CAMP grants through which it obligated and disbursed $51,498,000.[18]

129.    These new and continuation awards—which were issued prior to July 1, 2024—provided funding to HEP and CAMP projects nationwide that served approximately 6,000 students during the July 1, 2024 – June 30, 2025 year.[19]

130.    Congress later appropriated fiscal year 2025 funds to the Department through three continuing resolutions ("CRs").

---

[18] In 2024, the Department made 14 new awards and 38 continuation awards for HEP and 16 new grant awards and 47 continuation awards for CAMP. *See* Department of Education, *Education for the Disadvantaged Fiscal Year 2026 Budget Request* at 46–47, https://www.ed.gov/media/document/fy-2026-congressional-justification-education-disadvantaged-110143.pdf (hereinafter, "Education for the Disadvantaged FY 2026 Budget Request").

[19] *See* Education for Disadvantaged FY 2026 Budget Request, *supra* ¶ 128 n.18.

131.    A CR is a temporary measure that Congress uses to fund the federal government when regular appropriations bills are not passed by the start of the fiscal year to avoid a government shutdown and provide temporary funding for government operations.[20]

132.    CRs typically provide appropriations at a level based on the previous fiscal year's appropriations acts and for the same purposes as those provided in the previous fiscal year. *See* Cong. Rsch. Serv., R46595, Continuing Resolutions: Overview of Components and Practices, *supra* ¶ 131 n. 20, at 2.

133.    In September 2024, Congress passed and President Biden signed a CR to provide temporary funding for government operations through December 2024. *See* Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 118-83, 138 Stat. 1524 (2024). Congress enacted a second CR in December to extend government funding through March 2025. *See* American Relief Act, 2025, Pub. L. No. 118-158, 138 Stat. 1722 (2024).

134.    In March 2025, Congress enacted and President Trump signed a third CR to provide additional fiscal year 2025 federal funding. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, 139 Stat. 9 (2025) (the "2025 CR").

135.    The 2025 CR appropriated to federal agencies for fiscal year 2025 "[s]uch amounts as may be necessary, at the level specified . . . and under the authority and conditions provided in applicable appropriations Acts for fiscal year 2024." *See* § 1101(a), 139 Stat. at 10–11.

136.    The 2025 CR further states that "[a]ppropriations made by section 1101 shall be available to the extent and in the manner that would be provided by the pertinent appropriations Act." § 1102(a), 139 Stat. at 12.

---

[20] *See* Cong. Rsch. Serv., R46595, Continuing Resolutions: Overview of Components and Practices 1–4 (Mar. 27, 2025), https://congress.gov/crs_external_products/R/PDF/R46595/R46595.7.pdf.

137.    Importantly, the 2025 CR further states that "Appropriations provided by this division that, in the applicable appropriations Act for fiscal year 2024, carried a multiple-year . . . period of availability shall retain a comparable period of availability." § 1101(c), 139 Stat. at 12.

138.    The 2024 Appropriations Act provided funds for obligation and disbursement by the Department from July 1, 2024 through September 30, 2025—a "multiple-year period of availability."

139.    Thus, the 2025 CR appropriated funds to the Department to carry out HEP and CAMP at the same "level" as the 2024 Appropriations Act ($52.12 million) and in the same "manner" as the 2024 Appropriations Act (for the 2025-2026 academic year), and with a "comparative period" of "multi-year period of availability" as the 2024 Appropriations Act (July 1, 2025 – September 30, 2026) with a portion becoming "available" for obligation and disbursement on July 1, 2025 and the remainder becoming available on October 1, 2025.

### iii. The Department's Fiscal Year 2025 Spending Plan

140.    The 2025 CR also provided that "[n]ot later than 45 days after the date of the enactment of this division, each department and agency in subsection (c) shall submit to the Committees on Appropriations of the House of Representatives and the Senate a spending, expenditure, or operating plan for fiscal year 2025." § 1113(a), 139 Stat. at 14.

141.    On April 29, 2025, the Department submitted a fiscal year 2025 spending plan to the Appropriations Committees that omitted dozens of programs and activities ("FY 2025 Spending Plan"). The Department claimed approximately $13 billion in funds as "unallocated," including statutorily required funding. *See* Letter from Rosa L. DeLauro, Ranking Member of House Committee on Appropriations, and Patty Murray, Vice Chair of Senate Committee on

Appropriations, to Russel Vought, Director of OMB (May 27, 2025) (hereinafter, "Appropriations Committee May 27, 2025 Letter").[21]

142.    On May 23, 2025, the Department submitted a revised spending plan to the Appropriations Committees that included approximately $8 billion in unallocated funding. *See* Appropriations Committee May 27, 2025 Letter, *supra* ¶ 141 n.21.

143.    Upon information and belief, neither the original nor updated FY 2025 Spending Plan allocated FY 2025 Congressional funding for HEP and CAMP as statutorily required.

144.    Upon information and belief, the Department has not further updated the FY 2025 Spending Plan since May 23, 2025.

### iv.  The Executive Branch Proposes Eliminating HEP and CAMP in FY 2026

145.    Separate from its FY 2025 Spending Plan, in a May 2, 2025 Budget Request for *fiscal year 2026*, the Executive Branch proposed eliminating funding for HEP and CAMP altogether ("FY 2026 Budget Request").[22]

146.    The FY 2026 Budget Request stated: "The Administration does not request funding for Special Programs for Migrant Students for fiscal year 2026. Elimination of this program is part of the Administration's overall effort to restore fiscal discipline and reduce the Federal role in education. This program is extremely expensive, costing the Federal government as much as $17,000 for each student to obtain a high school equivalency credential. States and localities, not the Federal government, are best suited to determine whether to support the activities authorized under this program or similar activities, investing in their own communities in cost-effective ways

---

[21]    *Available    at*    https://democrats-appropriations.house.gov/sites/evo-subsites/democrats-appropriations.house.gov/files/evo-media-document/250527-delauro-murray-fy25-omb-spend-plan-letter.pdf.
[22]    *See* Department of Education, *Fiscal Year 2026 Budget Summary*, https://www.ed.gov/media/document/fiscal-year-2026-budget-summary-110043.pdf (hereinafter, FY 2026 Budget Request").

that are responsive to local needs and without unnecessary administrative burden imposed by the Federal government." *See* FY 2026 Budget Request, *supra* ¶ 145 n.22, at 13.

147.    Additionally, on May 2, 2025, the U.S. Office of Management and Budget ("OMB") delivered the President's recommendations on discretionary funding levels for fiscal year 2026.[23]

148.    Consistent with the FY 2026 Budget Request, the FY 2026 Discretionary Spending Recommendations proposed eliminating HEP and CAMP in fiscal year 2026.

149.    The FY 2026 Discretionary Spending Recommendations stated:

> The Budget eliminates programs that work to the detriment of children's academic success by encouraging movement from, rather than stability and consistency in, a single location. These programs have not been proven effective, are extremely costly, and encourage ineligible non-citizens to access U.S. IHEs, stripping resources from American students.

FY 2026 Discretionary Spending Recommendations, *supra* ¶ 147, at 6.

150.    The FY 2026 Discretionary Spending Recommendations specifically proposed eliminating "428" million dollars in funding for "Migrant Education and Special Programs for Migrant Students." *See* FY 2026 Discretionary Spending Recommendations, *supra* ¶ 147, at 6.

151.    This $428 million consists of $375.6 million appropriated by Congress in the 2025 CR for Migrant Education Programs under the ESEA and $52.1 million appropriated for HEP and CAMP. *See* FY 2026 Budget Request, *supra* ¶ 145 n.22, at 13, 19.

152.    In an accompanying document specific to the "Education for Disadvantaged Account," the Department listed the amount of Congressional annual appropriations for HEP and CAMP between fiscal years 2021 and 2025. Notably, the document describes the fiscal year 2025

---

[23] *See* Letter from Russell Vought, Director of OMB, to the Honorable Susan Collins, Chair, Senate Committee on Appropriations (May 2, 2025), https://www.whitehouse.gov/wp-content/uploads/2025/05/Fiscal-Year-2026-Discretionary-Budget-Request.pdf (hereinafter, "FY 2026 Discretionary Spending Recommendations").

amount for HEP and CAMP as "To be determined." *See* Education for the Disadvantaged FY 2026 Budget Request, *supra* ¶ 128, n.18, at 46.

**F.  The Department Initially Freezes but Eventually Releases MEP Grant Funds**

153.    Like HEP and CAMP, in both the FY 2026 Spending Plan and FY 2026 Discretionary Spending Recommendations, the Executive Branch proposed eliminating funding for state Migrant Education Programs (MEP) in fiscal year 2026.

154.    Like with funds appropriated for HEP and CAMP, Congress appropriated $375 million via the 2025 CR to the Department to carry out MEP during the July 1, 2025 – June 30, 2026 program year which this program also follows.

155.    As noted above, HEP and CAMP are under the same "Education for the Disadvantaged" account as MEP, and accordingly, HEP, CAMP and MEP were all funded by Congress in the same paragraph of the 2025 CR.

156.    The Department, however, failed to issue MEP grants to states by July 1, 2025.

157.    Accordingly, later in July, 24 state plaintiffs and the District of Columbia sued the Department, seeking a preliminary injunction to release the funds appropriated for MEP. *See California v. McMahon*, No. 25-cv-329-MRD-PAS (D.R.I.), *Complaint for Declaratory, Injunctive, and Mandamus Relief* (Doc. 1), *Plaintiff States' Motion for Preliminary Injunction* (Doc. 2).

158.    Less than two weeks later, the Department released MEP funding to states. *See Trump Abruptly Unfreezes All of the Education Funds He Had Withheld*, Education Week (July 25, 2025)[24]

---

[24]    *Available at* https://www.edweek.org/policy-politics/trump-abruptly-unfreezes-all-of-the-education-funds-he-had-withheld/2025/07.

**G.  The Department's HEP and CAMP Inaction**

      **i.  The Department Fails to Issue Continuation Awards**

159.    However, the Department to date has failed to award any grants and make any fiscal year 2025 funding available for HEP and CAMP.

160.    First, the Department has not issued any HEP and CAMP Continuation Awards to the Association's Affected Members for the July 1, 2025 to June 30, 2026 program year.

161.    Importantly, this is equally true for both the Affected Members and all other HEP and CAMP grant recipients.  Zero HEP and CAMP grants have been awarded for the 2025-2026 program year.

162.    Moreover, the Affected Members have not received any communications from the Department regarding the status of their grants.

163.    Depending on which year a particular Affected Member received a new HEP or CAMP award, their grants are not scheduled to expire until June 30 in either 2026, 2027, 2028, or 2029.

164.    The Affected Members with these grants complied with the applicable requirements to obtain Continuation Awards for the July 1, 2025 to June 30, 2026 budget period.

165.    Namely, each demonstrated "substantial progress" in achieving the "goals and objectives of the project" and the performance targets in their respective grant applications, each timely submitted the required financial performance reports, each continued to meet eligibility requirements, and each maintained the requisite financial and administrative management systems. *See* 34 C.F.R. § 75.253(a)(1)–(4); 34 C.F.R. § 75.118(a).

### ii.  The Department Fails to Decide Applications for New Awards

166.    The Department has been equally silent regarding the Affected Members' Applications for New Awards—and those submitted by applicants who are not among the Affected Members.

167.    As of May 2025—which is when the Department had represented it expected to award new grants—the Department had not informed Affected Members whether their Applications for New Awards had been selected or not.

168.    As of July 1, 2025—the date the HEP and CAMP program year began—the Department still had not communicated anything to them.

169.    As of the date of this Complaint, these Affected Members have not received any communications from the Department.

170.    As detailed below, due to the Department's inaction, the Association's Affected Members, many of which rely heavily, if not exclusively, on federal funding, have been forced to stop operating their HEP and CAMP projects and to lay off employees, and they are no longer providing services to students.

## VIOLATIONS OF LAW

171.    The Department's withholding of and delay in issuing Continuation Awards and in acting on Applications for New Awards violates the APA, the HEA, the Department's regulations and past practices, and the Constitution, in numerous respects.

172.    The HEA requires that the Secretary carry out HEP and CAMP. It specifically provides that "[t]he Secretary shall maintain and expand existing secondary and postsecondary high school equivalency program and college assistance migrant program projects located at institutions of higher education or at private nonprofit organizations working in cooperation with institutions of higher education." 20 U.S.C. § 1070d-2(a).

173.    "Statutory language that an official 'shall' perform an act has been repeatedly held to be mandatory in nature. It deprives the official of discretion and makes the commanded act a duty, a ministerial act." *Pennsylvania v. Weinberger*, 367 F. Supp. 1378, 1381 (D.D.C. 1973) (Commissioner of Education was required by statute to apportion to the states the full amount of appropriated funds for Parts A and C of Title V); *Chi. Women in Trades v. Trump*, 778 F. Supp. 3d 959, 991 (N.D. Ill. 2025) ("Congress expressly stated in the WANTO Act that the Executive 'shall' award grants for projects impacting women."). The President, and by extension the Department, cannot "repeal[] or amend[] parts of duly enacted statutes" after they become law. *See Clinton v. City of New York*, 524 U.S. 417, 439 (1998).

174.    Congress's statutory directive to the Secretary to "maintain and expand existing" HEP and CAMP projects is coupled with $52.12 million in fiscal year 2025 funds that Congress appropriated to the Department via the 2025 CR.

175.    The 2025 CR appropriated these funds to the Department and directed the agency to "carry out" HEP and CAMP, at the same level and in the same manner as the 2024 Appropriations Act, for the July 1, 2025 – June 30, 2026 program year.

176.    The 2025 CR directs that an initial wave of funding for HEP and CAMP "*shall become available* on July 1, 2025." "It is black letter appropriation law that, absent an express indication to the contrary, an appropriation is a mandate that the Executive Branch spend 'the full amount appropriated by Congress for a particular project or program.'" *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.); *see also Kane Cnty. v. United States*, 127 Fed. Cl. 696, 697 (2016) (finding that the phrase "appropriated sums shall be made available . . . for obligation or expenditure" amounted to "mandatory language."); *see also Child Trends, Inc, et al. v. U.S. Dep't of Educ.*, No. 25-cv-1154, 2025 WL 2379688, at *12 (D. Md. Aug. 15, 2025 2025)

(rejecting as "untenable" that language in the 2025 CR stating that funds "shall be for" programs gave the Department "discretion" "whether to spend the funds").

177.    "Under Article II of the Constitution and relevant Supreme Court precedents, the President must follow statutory mandates so long as there is appropriated money available and the President has no constitutional objection to the statute." *In re Aiken Cnty.*, 725 F.3d at 259 (Kavanaugh, J.).

178.    The Department's failure to obligate appropriated fiscal year 2025 funds through issuing Continuation Awards and acting on the Applications for New Awards and to then make obligated funds available on July 1, 2025 is unlawful.

179.    It is axiomatic that "[t]he United States Constitution exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018). The Executive Branch "does not have unilateral authority" to refuse to spend funds appropriated by Congress. *In re Aiken Cnty.*, 725 F.3d at 261 n.1.

180.    Through the Appropriations Clause, "the Constitution gives Congress exclusive power over federal spending." *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 763 F. Supp. 3d 36, 55 (D.D.C. 2025) (citation omitted); *see* U.S. Const. art. I, § 9, cl. 7. The Appropriations Clause was designed to "assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 428 (1990). Indeed, the Appropriations Clause "was intended as a restriction upon the disbursing authority of the Executive [Branch]." *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937).

181.    Likewise, under the Spending Clause, "[t]he power of the purse . . . rests in the Legislative Branch." *City of Chicago v. Sessions*, 888 F.3d 272, 283 (7th Cir. 2018); U.S. Const.

art. I, § 8, cl. 1. "Congress's power of the purse is the ultimate check on the otherwise unbounded power of the Executive." *U.S. House of Representatives v. Burwell*, 130 F. Supp. 3d 53, 76 (D.D.C. 2015).

182.    Thus, "the Executive Branch may not refuse to disperse federal grants already allocated by Congress to [recipients] without authorization by Congress." *City & Cnty. of San Francisco v. Trump*, No. 3:25-cv-1350-WHO, 2025 WL 1282637, at *27 (N.D. Cal. May 3, 2025); *Multnomah Cnty. v. Azar*, 340 F. Supp. 3d 1046, 1063–64 (D. Or. 2018).

183.    In contrast to the Appropriations and Spending Clauses, after a bill becomes law, the President is required to "'take Care that the Law be faithfully executed,'" and "agencies are there to serve that same end." *See Colorado v. U.S. Dep't of Health and Human Servs.*, No. 1:25-cv-121, 2025 WL 1426226, at *19 (D.R.I. May 16, 2025) (quoting U.S. Const. art. II, § 3).

184.    The Executive Branch has very limited options to not obligate and expend fiscal year 2025 appropriated funds.

185.    In 1974, Congress imposed statutory requirements on the Executive Branch dealing with the obligation and expenditure of appropriated funds. *See* Congressional Budget and Impoundment Control Act of 1974, 2 U.S.C. §§ 682–688 ("Impoundment Control Act").

186.    The Impoundment Control Act permits the Executive Branch to "impound" (or withholding spending of) federal funds under a small set of highly circumscribed conditions. *See Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 531 (N.D. Cal. 2017) (citing 2 U.S.C. §§ 683 *et seq.*).

187.    An "impoundment" includes both a "rescission" (a permanent withholding of budget authority) and a "deferral" (temporary delay of budget authority).

188.    In order to not obligate and spend and thus "impound" appropriated funds, the President is required to send a special message to Congress. Congress then has 45 calendar days to consider the proposal and approve it by passing a "rescission bill," which rescinds the agency's authorization to incur financial obligations. 2 U.S.C. § 683(a)–(b); *In re Aiken Cnty.*, 725 F.3d at 261 n.1 (Kavanaugh, J.) (the "President must propose the rescission of funds, and Congress then may decide whether to approve a rescission bill."). If Congress does not approve it, the amount proposed to be rescinded "shall be made available for obligation." 2 U.S.C. § 683(b).

189.    The Impoundment Control Act also permits the Executive Branch to propose to "defer" any budget authority provided for a specific purpose or project, in which the President also "shall transmit" "a special message" to Congress detailing the proposed deferral. 2 U.S.C. § 684(a). A "deferral" of budget authority "temporarily impound[s] appropriated funds." *See Global Health Council v. Trump*, No. 25-5097, 2025 WL 2326021, at *2 (D.C. Cir. Aug. 13, 2025). Deferrals are not permitted "based on 'policy' disagreements." *Id.* Congress may approve or disapprove a proposed deferral through an impoundment resolution. 2 U.S.C. § 682(4).

190.    President Trump has transmitted a special message to Congress proposing the rescission of approximately $9.4 billion of budgetary authority for other programs pursuant to section 1014(d) of the Impoundment Control Act. *See* Rescission Proposals Pursuant to the Congressional Budget and Impoundment Control Act of 1973, 90 Fed. Reg. 24298 (June 3, 2025).

191.    However, the President has not proposed to rescind or defer budget authority for HEP and CAMP.

192.    Thus, insofar as the Executive Branch has "policy" objections to HEP and CAMP, those objections do not confer the Department discretion to not obligate and expend funds that were appropriated by Congress for these programs.

193.    "[A] President sometimes has policy reasons . . . for wanting to spend less than the full amount appropriated by Congress for a particular project or program. But in those circumstances, even the President does not have unilateral authority to refuse to spend the funds. Instead, the President must propose the rescission of funds, and Congress then may decide whether to approve a rescission bill." *In re Aiken Cnty.*, 725 F.3d at 261 n.1 (Kavanaugh, J.).

194.    Likewise, absent rescission, "the President has no constitutional authority to withhold such funds and violates his obligation to faithfully execute the laws duly enacted by Congress if he does so." *See Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d at 531 (citing *Clinton v. City of New York*, 524 U.S. at 439 and U.S. Const. art. I, § 8, cl. 1).

195.    Here, the HEA states the Secretary "shall award grants for a 5-year period," and further, states that the Secretary "shall maintain and expand existing secondary and postsecondary high school equivalency program and college assistance migrant program projects." 20 U.S.C. §§ 1070d-2(a), (e).

196.    Further, here, the 2025 CR requires the Department to obligate and spend $52.12 million in Congressionally-appropriated fiscal year 2025 funds to "carry out" HEP and CAMP projects for the July 1, 2025 – June 30, 2026 program year.

197.    The Department has in effect, through silence and inaction, rescinded and deferred budget authority to obligate and spend Congressionally-appropriated funds for HEP and CAMP, despite not following the procedures for doing so.

198.    The Department's inaction runs roughshod over a "bulwark of the Constitution's separation of powers" by interfering with Congress's appropriation of fiscal year 2025 funds for HEP and CAMP. *U.S. Dep't of the Navy v. Fed. Labor Relations Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012).

199.    The Department's failure to issue the Continuation Awards and to act upon the Applications for New Awards also violates its own regulations requiring the Secretary to notify existing grant recipients if they will receive a continuation award no later than the first day of the following budget period. "If the Secretary makes a continuation award under this section—(1) The Secretary makes the award under §§ 75.231 through 75.236; and (2) The new budget period *begins on the day after the previous budget period ends*." 34 C.F.R.§ 75.253(d) (emphasis added).

200.    Consequently, the Department was necessarily required to issue the Continuation Awards no later than July 1, 2025, consistent with the forward-funded method Congress has long deployed for HEP and CAMP.

201.    To the extent the Department had decided to not make a Continuation Award to any particular HEP or CAMP grant recipient, it was required to communicate that decision to the recipient. Federal regulations provide that if the Secretary "decides not to make a continuation award . . . the Secretary *will notify the grantee of that decision*, the grounds on which it is based, and, consistent with 2 CFR 200.342, provide the grantee with an opportunity to request reconsideration of the decision." *See* 34 C.F.R. § 75.253(g) (emphasis added).

202.    Here, the Secretary has not "notif[ied]" any of the Affected Members with active HEP and CAMP grants (or any existing grant recipient) whether the Department decided to "not make a continuation award," let alone the "grounds on which" any such decision "is based." Affected Members likewise have not been provided "an opportunity to request reconsideration" of such a decision.

203.    The Department also failed to timely act on Affected Members' Applications for New Awards in violations of its regulations. Federal regulations provide that "the Secretary informs an applicant if its application . . . (1) [i]s not evaluated; or (2) [i]s not selected for funding."

*See* 34 C.F.R. § 75.218(a). The Department has not informed Affected Members who applied for a new HEP and CAMP grants whether or not their applications were "evaluated" or "selected for funding."

204.     The Department's failure to do so is contrary to its representation in the 2024 application packages that "Grants are expected to be awarded in May 2025." *See* 2025 HEP/CAMP Application Packages, *supra* ¶ 122 n.16 at 4; *Fiscal Year (FY) 2025 High School Equivalency Program (HEP) and College Assistance Migrant Program (CAMP) Pre-Application Webinar Questions and Answers, supra* ¶ 123 n.17.

205.     The Department's failure to do so is also contrary to its representations in the August 2024 notices that "[u]nder section 418A(e) of the HEA, except under extraordinary circumstances, the Secretary must award grants for a five-year period" and that "[w]e will not make an award for less than $180,000 for a single budget period of 12 months."

206.     The Department's failure to do so also is contrary to its historical practice of communicating award decisions between April and June to enable recipients to engage in planning for the program year beginning July 1.  *See also* 2021 CAMP Application Package, at 4 ("Grants are expected to be awarded in June 2021"); 2022 HEP Application Package, at 5 (June 2022).[25]

## HARM TO THE ASSOCIATION AND AFFECTED MEMBERS

207.     Without funds, the Association and the Affected Members will be irreparably harmed.

---

[25] *See* Department of Education, FY 2021 Application for New Grants Under the College Assistance Migrant Program, *available at* https://www.ed.gov/sites/ed/files/2020/12/Application-for-College-Assistance-Migrant-Program.pdf; Department of Education, FY 2022 Application for New Grants Under The High School Equivalency Program, *available at* https://www.ed.gov/media/document/fy-22-application-instructions-high-school-equivalency-programpdf-11531.pdf.

**Harm to the Association**

208.    The Association is the sole national nonprofit membership organization for IHEs and nonprofit organizations that receive HEP and/or CAMP grants. The viability and success of the Association's members is at the core of the Association's mission.

209.    "[T]he detriment to Plaintiffs' organizational missions . . . cannot be remedied through retroactive relief." *New York v. McMahon*, No. 25-cv-10601-MJJ & No. 25-cv-10677-MJJ, 2025 WL 1463009, at *31 (D. Mass. May 22, 2025); *see also Mediplex of Mass., Inc. v. Shalala,* 39 F. Supp. 2d 88, 99 (D. Mass. 1999) (finding that owner of a nursing facility had "an interest in protecting the health of its residents and [could] assert harm to them as irreparable harm for the purpose of th[e] motion [for preliminary injunction]").

210.    The Association would no longer be able to provide its annual Association scholarship or internship opportunities to students, and would no longer be able to provide emergency funds to help students overcome various hardships to remain in school. The Association would no longer be able to host its annual conference that brings together the HEP and CAMP community for professional development, and would no longer be able to offer the educational workshops and webinars that empower HEP and CAMP staff to facilitate effective programs.

211.    "Actions by a defendant that 'make it more difficult for' an organization 'to accomplish [its] primary mission . . . provide injury for purposes . . . of . . . irreparable harm.'" *Nat'l Treasury Emps. Union v. Vought*, 774 F. Supp. 3d 1, 49 (D.D.C. 2025), *vacated*, 2025 WL 2371608 (D.C. Cir. Aug. 15, 2025) (citing *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016)); *see also City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs.*, 408 F. Supp. 3d 1057, 1125–26 (N.D. Cal. 2019), *aff'd*, 981 F.3d 742 (9th Cir. 2020) (finding irreparable injury where the goals of providing healthcare and legal services were frustrated and

that plaintiffs' changes to their programs and other diversions of resources constituted irreparable harm).

212.    The Association comprises dues-paying members that operate approximately 115 HEP and CAMP projects. Without funding of HEP and CAMP grants, the Association will no longer have dues-paying members.  "While ordinary economic injuries are usually insufficient to require injunctive relief, financial harm can 'constitute irreparable harm . . . where the loss threatens the very existence of the movant's business.'" *Climate United Fund v. Citibank, N.A.*, 775 F. Supp. 3d 335, 349 (D.D.C. 2025) (omission in original) (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)); *RFE/RL, Inc. v. Lake*, No. 1:25-cv-799-RCL, 2025 WL 1232863, at *7 (D.D.C. Apr. 29, 2025).

## Harm to the Affected Members

213.    Absent immediate Court intervention, the Association's Affected Members will suffer irreparable harm as well.

214.    Several Affected Members, including the University of Washington, Cambridge Academies, Northern New Mexico College and many others, rely exclusively or heavily on federal funding to sustain their HEP and CAMP projects.

215.    The University of Washington ("UW") operates a CAMP project and received a new award in 2020. Due to the five-year award period expiring on June 30, 2025, UW applied for a new award in November 2024 with the expectation that—if selected—it would be able to continue its project for the 2025–2026 program year. UW relies exclusively on federal funding for its CAMP project. Despite typically receiving its CAMP grant awards in May or June of the budget year, with funds becoming available on July 1, UW has not received any communications about the status of its Application for a New Award. If UW does not obtain funding for its project, it will

lay off all staff members, and the incoming cohort of students will not be able to participate in its CAMP projects. UW has set layoff notices to CAMP staff for August 31, 2025.

216.    Cambridge Academies ("Cambridge") has operated its CAMP project since 2022 and, like UW, it relies entirely on federal funding. It has not received its Continuation Award for the 2025–2026 program year that it expected to receive by July 1, 2025. At Modesto Junior College where Cambridge operates its CAMP project, students attend a spring college prep workshop and summer bridge program before beginning their first semester. A number of these students participate in various leadership and academic conference opportunities throughout California and Arizona. Without CAMP funding from the Department, Cambridge's project will be discontinued immediately.

217.    Northern New Mexico College ("NNMC") was awarded its first CAMP grant funding in 2021 and has yet to receive its Continuation Award for its fifth and final budget period which ends June 30, 2026. NNMC relies heavily on federal funding, and without such funds, NNMC will be forced to eliminate its CAMP project because it does not have sufficient independent financial resources to sustain it. CAMP grant funded employees are likely to be eliminated.

218.    NNMC's separate HEP project faces the same fate. NNMC was awarded a five-year HEP grant in 2020 that expired on June 30, 2025. To ensure continuation of its HEP project, NNMC applied for a new HEP grant award in November 2024. NNMC has yet to receive a decision from the Department regarding its Application for a New Award. NNMC will shut down this project too without relief. Already, NNMC has been unable to enroll students who had planned to attend HEP and is turning away students at the door.

219.    Other Affected Members operate HEP projects and rely heavily on federal funding, including Michigan State University ("MSU"). MSU applied for and received its first HEP grant for the 2024–2025 year. MSU expected to receive notice of its Continuation Award in May or June of 2025, and to receive funding on July 1, but it has not received either. Because it relies largely on federal funding, MSU will shut down its program if the Department does not issue its Continuation Award for HEP. Without federal funding, MSU will also have to lay off a number of its staff.

220.    "When a program's 'existence relies on grant money, harm is certain once the grant funds are withdrawn.'" *S. Educ. Found. v. U.S. Dep't of Educ.*, No. 1:25-cv-1079, 2025 WL 1453047, at *14 (D.D.C. May 21, 2025) (quoting *Climate United Fund*, 2025 WL 1131412, at *117).

221.    As discussed, these and other Affected Members have temporarily shut down their HEP and CAMP projects. Without immediate relief from the Court and decisions on their Applications for New Awards and Continuation Awards for the 2025-2026 year, which already began on July 1, 2025, they will be forced to shut them down permanently.

**Harm to HEP and CAMP Students**

222.    Likewise, the harm to Affected Members projects' participants from the Department's inaction and delay is immediate and irreversible.

223.    More than 6,000 students were slated to participate in HEP and CAMP projects during the 2025-2026 program year. These students have already lost and will continue to lose the critical educational and essential support services Congress that determined they need.

224.    "A freeze in federal funding for education would catastrophically disrupt student instruction . . . ." *New York v. Trump*, 769 F. Supp. 3d at 143 (internal quotation omitted); *see also Plyler v. Doe*, 457 U.S. 202, 221 (1982) (noting the "lasting impact of [education's] deprivation

- 47 -

on the life of the child," that "education has a fundamental role in maintaining the fabric of our society," and "the significant social costs borne by our Nation when select groups are denied the means to absorb the values and skills upon which our social order rests.").

225.    If immediate injunctive relief is not entered, these students will suffer irreversible harm in the meantime. "The detriment to . . . student education cannot be remedied through retroactive relief." *New York v. McMahon*, 2025 WL 1463009, at *31.

### No Harm to the Department

226.    Meanwhile, the Department will suffer no harm from an injunction directing the agency to act upon and issue Continuation Awards and to act upon the Applications for New Awards.

227.    "The Government is not harmed where an order requires them to disburse funds that Congress has appropriated and that Agencies have already awarded. . . . And an agency is not harmed by an order prohibiting it from violating the law." *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 440, 476–77 (D.R.I. 2025); *New York v. Trump*, 769 F. Supp. 3d at 146 ("The Defendants are not harmed where the order requires them to disburse funds that Congress has appropriated to the States and that they have obligated.").

228.    There is no public interest in the Department's continued inaction and delay. As the D.C. Circuit has explained, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters*, 838 F.3d at 12. "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Id.* (internal quotations omitted)

229.    Critically, the Association seeks preliminary injunctive relief in the form of an order directing the Department and the Secretary to comply with their duties to issue Continuation Awards and to act upon the Applications for New Awards, in the manner required under the

applicable law and regulations. The Association does not seek an order directing Defendants to automatically issue Continuation Awards and to decide the Applications for New Awards *in favor of each and every recipient and applicant, respectively.* It simply seeks an order that requires they immediately comply with the statutory and regulatory processes for doing so to prevent further harm.

230.    The requested injunction, of course, is not an invitation for the Department in response to issue affirmative decisions to *not* make new awards and to *not* make continuation awards. The Department has been appropriated $52 million to carry out HEP and CAMP for the July 1, 2025 – June 30, 2026 year, and it is required to obligate and disburse these funds. Necessarily, the Department *must* award grants, not just to the Affected Members, but to all IHEs and nonprofits who are in the same position as the Affected Members. As the Department stated in the August 2024 notices, "[i]n accordance with section 418A, the Secretary makes HEP awards based on the number, quality, and promise of the applications."

## CAUSES OF ACTION

### Count I – Administrative Procedure Act
### Unlawfully Withheld and Unreasonably Delayed Agency Action

231.    The Association realleges and incorporates by reference the preceding allegations as though fully set out herein.

232.    The APA provides that a reviewing court "shall . . . compel agency action unlawfully withheld or unreasonably delayed[.]" 5 U.S.C. § 706(1).

233.    This type of APA claim arises "where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take.*" *See Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004) (emphases in original).

234. "[D]elayed, broken down grant negotiations and indefinite withholding of congressionally appropriated funds, with a statutorily created entity on the brink of collapse, creates a scenario begging for APA review." *Widakuswara v. Lake*, 779 F. Supp. 3d 10, 33 n.23 (D.D.C. 2025).

235. The Department and the Secretary have violated Section 706(1) of the APA by unlawfully withholding issuance of the Continuation Awards and by unlawfully withholding action on the Applications for New Awards. *See Widakuswara*, 779 F. Supp. 3d at 36–37 (finding it likely that defendants violated Section 706(1) by unlawfully withholding the international broadcasting programming and grants that USAGM is statutorily required to provide).

236. The Department and the Secretary have violated Section 706(1) of the APA by unreasonably delaying issuance of the Continuation Awards and by unreasonably delaying action on the Applications for New Awards.

237. The APA provides judicial review, *see* 5 U.S.C. § 702, "except to the extent that . . . agency action is committed to agency discretion by law," 5 U.S.C. § 701(a)(2). However, "courts have held that § 701(a)(2) does not apply when the agency's actions contravene (1) appropriations laws and (2) other applicable regulatory and statutory authority." *Colorado v. U.S. Dep't of Health & Hum. Servs.*, 2025 WL 1426226, at *12. The Department and the Secretary have no discretion to *not* issue the Continuation Awards and to *not* act on the Applications for New Awards; the regulations detail the strict processes and standards the Department and the Secretary must follow to act on them, which they did not do here.

238. The Association is entitled to a declaration that the Department and the Secretary have violated Section 706(1) by unlawfully withholding and/or unreasonably delaying required agency action, and further is entitled to a preliminary and permanent injunction ordering the

Department to immediately issue the Continuation Awards, act upon the Applications for New Awards, and disburse Congressionally-appropriated fiscal year 2025 funds to carry out HEP and CAMP, consistent with their duties under applicable law and regulations.

## Count II – Administrative Procedure Act
### Agency Action Contrary to Law and in Excess of Statutory Authority

239.    The Association realleges and incorporates by reference the preceding allegations as though fully set out herein.

240.    The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702; *see Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 22 (2018) ("The Administrative Procedure Act creates a basic presumption of judicial review for one suffering legal wrong because of agency action.") (cleaned up); *Mach Mining, LLC v. E.E.O.C.*, 575 U.S. 480, 486 (2015) ("Congress rarely intends to prevent courts from enforcing its directives to federal agencies. For that reason, this Court applies a 'strong presumption' favoring judicial review of administrative action." (quoting *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 670 (1986)).)

241.    The APA requires courts to "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory . . . authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

242.    Contrary to law "means, of course, *any* law, and not merely those laws that the agency itself is charged with administering." *FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003) (emphasis in original).

243. "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024).

244. The Department's and the Secretary's actions are contrary to the HEA's mandate that the Secretary "shall maintain and expand existing [HEP and CAMP] program projects."

245. The Department's and the Secretary's actions are contrary to the HEA's mandate that the Secretary "shall award" HEP and CAMP grants.

246. The Department's and the Secretary's actions are contrary to Congress's appropriations of fiscal year 2025 funds to the Department to "carry out" HEP and CAMP for the July 1, 2025 to June 30, 2026 year.

247. Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, the Association is entitled to a declaration that the Department and the Secretary lack legal authority to not issue Continuation Awards and to not act upon the Applications for New Awards, and in not doing so, have acted contrary to law, in excess of statutory authority, and in violation of the APA. The Association is further entitled to a preliminary and permanent injunction ordering the Department and the Secretary to immediately issue the Continuation Awards, act upon the Applications for New Awards, and to disburse Congressionally-appropriated fiscal year 2025 funds to carry out HEP and CAMP, consistent with their duties under applicable law and regulations.

<u>**Count III – Administrative Procedure Act**</u>
**Without Observance of Procedure Required By Law**

248. The Association realleges and incorporates by reference the preceding allegations as though fully set out herein.

249. The APA directs courts to hold unlawful and set aside agency actions that are "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

250.    An agency's action may be set aside pursuant to the APA if the action violates the agency's own procedures, particularly if that error prejudices the interest of a person before the agency. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545–47 (6th Cir. 2004).

251.    When a federal agency has promulgated "[r]egulations with the force and effect of law," those regulations "supplement the bare bones" of federal statutes. *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 265, 268 (1954).

252.    "An agency has the duty to follow its own federal regulations," and "[f]ailure to follow applicable regulations can lead to reversal of an agency order . . . ." *Nelson v. Immig. and Naturalization Serv.*, 232 F.3d 258, 262 (1st Cir. 2000).

253.    The Department and the Secretary did not observe procedures required by law in numerous respects.

254.    Under federal regulations, the Department and the Secretary were required to issue Continuation Awards by July 1, 2025, which they did not do. 34 C.F.R. § 75.253(d), (g).

255.    Under federal regulations, the Department and the Secretary were required to notify existing grant recipients if it decided not to issue a Continuation Award, the grounds on which such a decision was based, and afford them "opportunity to request reconsideration of the decision," which they did not do. 34 C.F.R. § 75.253(g).

256.    Under federal regulations, the Department and the Secretary were required to inform applicants with Applications for New Awards whether or not their applications had been "evaluated" and "selected" by July 1, 2025, which they did not do. *See* 34 C.F.R. § 75.218(a).

257.    Indeed, per the August 2024 notices, the Department and the Secretary represented to prospective applicants that "[i]f your application is not evaluated or not selected for funding, we notify you."

258.   Under federal regulations, the Department and the Secretary were required to provide applicants whose Applications for New Awards were not evaluated or selected the opportunity to "request an explanation of the reason its application was not evaluated or selected" and to "provide[] that explanation," which they did not do. *See* 34 C.F.R. § 75.218(b).

259.   Under federal regulations, the Department and the Secretary were required to make appropriated funds available to successful grant recipients on July 1, 2025, which they did not do. 34 C.F.R. § 75.253(d).

260.   Under federal regulations, the Department and the Secretary were required to "authorize" grant recipients "to incur financial obligations of the funds awarded" by July 1, 2025, which they did not do. 2 C.F.R. § 200.1.

261.   Under the Department's and the Secretary's policies and procedures, they review applications for new awards and issues them before July 1, 2025 to allow for advance planning, consistent with the forward-funded method Congress has utilized for HEP and CAMP appropriations.

262.   Indeed, the Department and the Secretary stated that they would inform applicants of decisions on applications by May 2025.

263.   The Association is entitled to a declaration that the Department and the Secretary violated the Department's own regulations, procedures and policies, and further is entitled to a preliminary and permanent injunction ordering the Department and the Secretary to immediately issue the Continuation Awards, act upon the Applications for New Awards, and disburse Congressionally-appropriated fiscal year 2025 funds to carry out HEP and CAMP, consistent with their duties under applicable law and regulations.

### Count IV – Administrative Procedure Act
**Violation of the Separation of Powers, Appropriations and
Spending Clauses, and the Take Care Clause**

264.    The Association realleges and incorporates by reference the preceding allegations as though fully set out herein.

265.    Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

266.    The Constitution assigns to Congress the power of the purse. Under the Appropriations Clause, it is Congress that is to make decisions regarding how to spend taxpayer dollars. *See* U.S. Const. art. I, § 9 cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law . . . .").

267.    Congress also possesses exclusive power to legislate. The Spending Clause enumerates that: "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives." U.S. Const. art. I, § 1; *see also Clinton v. City of New York*, 524 U.S. at 438 ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes.").

268.    Congress exercised its legislative power to authorize HEP and CAMP and its spending power to appropriate fiscal year 2025 funds to the Department to carry out these programs.

269.    The Department's and the Secretary's failure to obligate and disburse fiscal year 2025 appropriated funds as required by Congress violates the Separation of Powers because the Executive Branch has overridden the careful judgments of Congress and is attempting to exercise authority granted to the Legislative Branch.

270.    The Department and the Secretary are in violation of the Appropriations and Spending Clauses because the Executive Branch is attempting to exercise authority granted to the Legislative Branch. When money has been appropriated by Congress, "the Executive has no residual constitutional power to refuse to spend these appropriations." *Guadamuz v. Ash*, 368 F. Supp. 1233, 1244 (D.D.C. 1973).

271.    The Department's and the Secretary's failure to "award" HEP and CAMP grants and failure to "maintain and expand [HEP and CAMP] program projects" as required under the HEA violates the Take Care Clause.

272.    The Constitution requires that the Executive Branch must "take Care that the Laws be faithfully executed . . . ." U.S. Const. art. II, § 3; *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 327 (2014) ("Under our system of government, Congress makes laws and the President . . . faithfully executes them.") (cleaned up).

273.    The Association is entitled to a declaration that the Department and the Secretary have violated the Constitution's Separation of Powers doctrine and the Appropriations, Spending, and Take Care Clauses. The Association is further entitled to a preliminary and permanent injunction ordering the Department and the Secretary to immediately issue the Continuation Awards, act upon the Applications for New Awards, and disburse Congressionally-appropriated fiscal year 2025 funds to carry out HEP and CAMP, consistent with their duties under applicable law and regulations.

### Count V – Standalone Constitutional Claims
**Violation of the Separation of Powers, the Appropriations Clause,
the Spending Clause, and the Take Care Clause**

274.    The Association realleges and incorporates by reference the preceding allegations as though fully set out herein.

275.    The Association brings implied, non-statutory claims against the Department and the Secretary for violation of the Constitution, including independent violations of the Separation of Powers doctrine, the Appropriations Clause, the Spending Clause, and the Take Care Clause.

276.    The Supreme Court "has continued to recognize implied equitable actions directly under the Constitution." *Nat' Treasury Emps. Union v. Vought*, No. 25-5091, 2025 WL 2371608, at *18 (D.C. Cir. Aug. 15, 2025).

277.    The Department and the Secretary violated the Constitution through their failure to issue the Continuation Awards, to act upon the Applications for New Awards, and to disburse Congressionally-appropriated fiscal year 2025 funds to carry out HEP and CAMP, as required by Congress under the HEA.

278.    The Association is entitled to a declaration that the Department and the Secretary have violated the Constitution's Separation of Powers doctrine and the Appropriations, Spending, and Take Care Clauses. The Association is further entitled to a preliminary and permanent injunction ordering the Department and the Secretary to immediately issue the Continuation Awards, act upon the Applications for New Awards, and disburse Congressionally-appropriated fiscal year 2025 funds to carry out HEP and CAMP, consistent with their duties under applicable law and regulations.

## Count VI – Administrative Procedure Act
### Arbitrary and Capricious

279.    The Association realleges and incorporates by reference the preceding allegations as though fully set out herein.

280.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

281.    The Department's and the Secretary's decision to not issue Continuation Awards and to not act upon the Applications for New Awards is reviewable final agency action under § 706(2)(A).

282.    Through failure to issue new and continuing awards, the Department has effectively made affirmative decisions to not issue continuation awards and to not select applications for new awards, which themselves are final agency actions and that have the same practical legal consequences as simply not acting at all. *See Policy & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62, 77 (D.D.C. 2018) ("shortening" of grant recipient's grant was "functional equivalent" of "termination" of the grant).

283.    Namely, in both affirmative and silent terminations and cancellations, appropriated funds are not being made available to cover costs and expenses incurred in performing project activities during the July 1, 2025 – June 30, 2026 program year.

284.    An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must "articulate a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted).

285.    The only recent statement provided by the Department regarding HEP and CAMP is that the Executive Branch is seeking to eliminate funding for HEP and CAMP in fiscal year 2026. This explanation is inherently arbitrary and capricious insofar as it provided the basis for the Department's decision to not issue Continuation Awards and to not act upon the Applications for New Awards with *fiscal year 2025* funds that have been appropriated to the Department. "[A]n agency may not rely on political guesswork about future congressional appropriations as a basis

for violating existing legal mandates." *In re Aiken Cnty.*, 725 F.3d at 260; *see also Nat'l Endowment for Democracy v. United States*, No. 25-cv-648, 2025 WL 2305477, at *5 (D.D.C. Aug. 11, 2015) (holding that government withholding and "subjecting $95 million of the Endowment's funding to 'review for alignment with Administration priorities'" was arbitrary and capricious and contrary to law).

286.    The Department's and the Secretary "departure from [past] practice, with no explanation," is "arbitrary and capricious." *Policy & Rsch.*, 313 F.Supp. 3d at 83. The Department has long awarded grants before July 1 and made funds available to recipients on July 1. Its failure to do so this year upsets settled reliance interests of HEP and CAMP applicants and existing recipients that the Department would follow this same schedule this year.

287.    The Association is entitled to a declaration that the Department and the Secretary's actions are arbitrary and capricious. The Association is further entitled to a preliminary and permanent injunction ordering the Department and the Secretary to immediately issue the Continuation Awards, act upon the Applications for New Awards, and disburse Congressionally-appropriated fiscal year 2025 funds to carry out HEP and CAMP, consistent with their duties under applicable law and regulations.

## Count VII – Ultra Vires

288.    The Association realleges and incorporates by reference the preceding allegations as though fully set out herein.

289.    A claim seeking *ultra vires* review is available where (1) review is not expressly precluded by statute, (2) there is no alternative procedure for review of the statutory claim" and (3) the challenged action is "plainly" in "excess of [the agency's] delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022).

290.    The Department's and the Secretary's actions are plainly in excess of their delegated powers and are contrary to the clear and mandatory duties under the HEA to "maintain and expand" HEP and CAMP and to "award" grants.

291.    Independently, the Department's and the Secretary's actions are plainly in excess of their delegated powers and are contrary to the clear and mandatory duties under the HEA to "carry out" HEP and CAMP for the 2025-2026 academic year.

292.    Review of these claims is not precluded any statute. To the extent no relief is available under the forgoing causes of action, the Association seeks *ultra vires* review of the Department's and the Secretary's actions.

293.    The Association is entitled to a declaration that the Department and the Secretary acted *ultra vires* in excess of statutory authority. The Association is further entitled to a preliminary and permanent injunction ordering the Department and the Secretary to immediately issue the Continuation Awards, act upon the Applications for New Awards, and disburse Congressionally-appropriated fiscal year 2025 funds to carry out HEP and CAMP, consistent with their duties under applicable law and regulations

## Count VIII – Writ of Mandamus, 28 U.S.C. §§ 1361, 1351

294.    The Association realleges and incorporates by reference the preceding allegations as though fully set out herein.

295.    To the extent no relief is available under the forgoing causes of action, the Association pleads in the alternative that it is entitled to a writ of mandamus ordering the Department and the Secretary to immediately issue the Continuation Awards, act upon the Applications for New Awards, and disburse Congressionally-appropriated fiscal year 2025 funds to carry out HEP and CAMP, consistent with their duties under applicable law and regulations.

296.    The Department and the Secretary are officers, employees or agencies of the United States. "The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361.

297.    The relief sought as to the Department and the Secretary is necessary and appropriate to aid in the jurisdiction of this Court and agreeable to the usages and principles of law. "The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a).

298.    The Department and the Secretary violated and are continuing to violate a clear duty to act by failing to issue Continuation Awards, by failing to act upon the Applications for New Awards, and by failing to disburse and make Congressionally-appropriated fiscal year 2025 funds available.

299.    The Department's and the Secretary's violations have caused extraordinary and ongoing harm to the Association and its Affected Members for which no adequate alternative remedy exists.

## PRAYER FOR RELIEF

WHERE, Plaintiff seeks the following relief:

   a.    An order and declaration that Defendants' failure to issue the Continuation Awards and failure to act upon the Applications for New Awards was unlawfully withheld and unreasonably delayed under the APA;

   b.    An order and declaration that Defendants' failure to issue the Continuation Awards and to act upon the Applications for New Awards was in excess of statutory authority and contrary to law;

   c.    An order and declaration that Defendants' failure to issue the Continuation Awards and to act upon the Applications for New Awards was without observance of procedure required by law;

d.  An order and declaration that Defendants' failure to issue the Continuation Awards and to act upon the Applications for New Awards was contrary to constitutional right in violation of the APA and the Separation of Powers, the Spending Clause, the Appropriations Clause, and the Take Care Clause of the Constitution;

e.  An order and declaration that Defendants' failure to issue the Continuation Awards and to act upon the Applications for New Awards violates the Separation of Powers, the Spending Clause, the Appropriations Clause, and the Take Care Clause of the Constitution;

f.  An order and declaration that Defendants' failure to issue the Continuation Awards and to act upon the Applications for New Awards was arbitrary and capricious;

g.  An order and declaration that Defendants' failure to issue the Continuation Awards and to act upon the Applications for New Awards is *ultra vires*;

h.  A preliminary injunction directing Defendants to immediately issue the Continuation Awards, to act upon the Applications for New Awards, and to disburse Congressionally-appropriated fiscal year 2025 funds to carry out HEP and CAMP, consistent with their duties under applicable law and regulations;

i.  A writ of mandamus directing Defendants to immediately issue the Continuation Awards, to act upon the Applications for New Awards, and to disburse Congressionally-appropriated fiscal year 2025 funds to carry out HEP and CAMP, consistent with their duties under applicable law and regulations;

j.  A permanent injunction prohibiting Defendants from further withholding and delaying required agency action, including but not limited prohibiting Defendants from failing to issue the Continuation Awards, failing to act upon the Applications for New Awards, and failing to disburse Congressionally-appropriated fiscal year 2025 funds to carry out HEP and CAMP;

k.  An order awarding the Association its attorneys' fees and costs pursuant to 28 U.S.C. § 2412; and

l.  Any further relief as the Court may deem just and proper.

Respectfully submitted,

THOMPSON COBURN LLP

*/s/ Jayna Marie Rust*
Jayna Marie Rust (D.C. Bar No. 998326)
1909 K Street N.W., Suite 600
Washington, D.C. 20006
P.      (202) 585-6929
E.      jrust@thompsoncoburn.com

Ollie. A. Cleveland (Admission forthcoming)
Brandt P. Hill (*Pro hac vice* forthcoming)
Lorrie L. Hargrove (*Pro hac vice* forthcoming)

2311 Highland Ave., Suite 330
Birmingham, AL 35205
P:        (205) 769-4303
E.        tcleveland@thompsoncoburn.com
          bhill@thompsoncoburn.com
          lhargrove@thompsoncoburn.com

*Counsel for The National HEP-CAMP Association*